UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEAN FABRICE NDZANA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:22-cv-01540-JMS-MJD |
| | ) | |
| BALL STATE UNIVERSITY, THE BOARD OF | ) | |
| TRUSTEES OF BALL STATE UNIVERSITY, DR. | ) | |
| SUSANA RIVERA-MILLS, and DR. PAUL | ) | |
| SPENGLER, | ) | |
| | ) | |
| *Defendants*. | ) | |

## **ORDER**

Plaintiff Jean Fabrice Ndzana, a twice-admitted plagiarist, was a doctoral student in the Counseling Psychology Department at Ball State University ("Ball State").  In his third year, he was accused of and admitted to plagiarism found in both an assignment before his doctoral committee and on his dissertation.  He was consequently dismissed from the program.  Mr. Ndzana sued Defendant Ball State alleging that it dismissed him due to his race in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* ("Title VI") and sued Defendants the Board of Trustees of Ball State University, Dr. Paul Spengler, and Dr. Susana Rivera-Mills in their official and individual capacities alleging the same under the Equal Protection Clause via 42 U.S.C

§ 1983.[1]  Defendants have filed a Motion for Summary Judgment, [Filing No. 55], and Mr. Ndzana

has moved to strike certain arguments in Defendants' Reply Brief to Plaintiff's Response Brief in

Opposition to Defendant[s'] Motion for Summary Judgment ("Defendants' Reply Brief"), [Filing

No. 72].  The motions are now ripe for the Court's consideration.

# I.
## MOTION TO STRIKE

Before turning to the factual background and substantive summary judgment arguments,

the Court addresses Mr. Ndzana's motion to strike.  [Filing No. 72.]  Mr. Ndzana moves to strike

portions of Defendants' Reply Brief on the ground that the reply impermissibly raises new

arguments regarding two comparators—Ms. Ajasha Long and Ms. Rawan Atari—not contained in

their original Motion for Summary Judgment.  [Filing No. 72.]  He argues that Defendants "should

not be allowed to introduce completely new comparator arguments [and evidence] regarding . . .

[Ms. Atari and Ms. Long] in . . . their reply brief after simply forgetting to include it in their original

lengthy Summary Judgment Motion."  [Filing No. 72 at 3.]  In support, he cites to *Lady Di's, Inc.*

*v. Enhanced Servs. Billing, Inc.*, 2010 WL 1258052, at *2 (S.D. Ind. March 25, 2010), and *Reis v.*

*Robins*, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015).  [Filing No. 72 at 2-3.]

---

[1] It is unclear whether Mr. Ndzana is suing the Board of Trustees in both its official and individual capacities.  Mr. Ndzana's Amended Complaint states that he "brings this action against Defendants, Ball State University [alleging a violation of Title VI] and the Board of Trustees of Ball State University ("Trustees"), Dr. Susana Rivera-Mills ("Rivera-Mills") and Dr. Paul Spengler ("Spengler") in their official capacity, for prospective and injunctive relief and in their individual capacity [for an equal protection violation]."  [Filing No. 21.]  Yet Mr. Ndzana does not name the individuals that comprise the Board of Trustees anywhere in his Amended Complaint or Statement of the Claims, or otherwise refer to them throughout the filings.  [*See* Filing No. 21; Filing No. 49; Filing No. 67.]  Because an entity cannot be sued in an individual capacity and since Mr. Ndzana does not name the members of the Board of Trustees as defendants, the Court assumes that Mr. Ndzana intends to only sue the Board of Trustees in its official capacity.

Regarding Ms. Atari, Mr. Ndzana misunderstands the law and mischaracterizes why Defendants address Ms. Atari in their Reply Brief.  Defendants address Ms. Atari in response to Mr. Ndzana's argument, which is entirely proper and not considered a "new argument," even according to the exact case that Mr. Ndzana relies upon.  *See Lady Di's, Inc.,* 2010 WL 1258052, at *2 (holding that it was permissible for the defendant to reply to an argument that the plaintiff raised in their response, even though the argument did not originally appear in the defendant's motion).  The court explained:

> In its Reply Brief, [plaintiff] addressed the application of Indiana Code sections relating to Plaintiff's claims, which did not appear in [defendant's] original Brief in Support of the motion. [Plaintiff] had clearly relied upon those Indiana Code sections in its brief responding to [defendant's] motion. Thus, [defendant] did not impermissibly raise any new arguments. Rather, it simply responded to the opposition's arguments, which was entirely proper. *See, e.g.*, *Eagle Corp. v. H2O Industrial Services, Inc.,* 2005 WL 1429279 (N.D. Ind. Jun. 8, 2005) ("[T]he arguments . . . that are raised for the first time in the defendant's reply are addressed only because the plaintiff raised the [same issue] in its response. It is logical that defendant addressed the plaintiff's arguments in its reply."). Accordingly, because [defendant] did not go beyond the arguments previously presented to the Court by [plaintiff], the Motion to Strike shall be *denied*.

*Id.* (emphasis in original).  Here, Mr. Ndzana addressed Ms. Atari in his Brief in Opposition to Defendant[s'] Motion for Summary Judgment, and Defendants simply responded to that argument in their Reply Brief.  This is completely appropriate.  *See id.*  Mr. Ndzana's other case in support does not support his argument but simply recites the general law that arguments may not be raised for the first time in reply briefs.  *See Reis*, 2015 WL 846526, at *2.  But as explained, Defendants' argument regarding Ms. Atari cannot be characterized under that general law for it is a responsive argument.  Therefore, Mr. Ndzana's motion to strike, [72], is **DENIED** to the extent that it seeks to strike Defendants' arguments regarding Ms. Atari.

As for Mr. Ndzana's request to strike Defendants' arguments regarding Ms. Long, the Court notes that argument regarding Ms. Long first appears in Defendants' Reply Brief.  [Filing No. 70.]

Mr. Ndzana did not raise any argument regarding Ms. Long, and so Defendants' argument cannot be said to be responding to the opposition arguments like above. Therefore, it is a new argument, and Mr. Ndzana's motion to strike, [72], is **GRANTED** to the extent that it seeks to strike Defendants' arguments regarding Ms. Long.[2]

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment

---

[2] Striking any argument about Ms. Long, however, has no impact on this case. Mr. Ndzana waived any argument regarding Ms. Long as a valid comparator because he did not argue that she is a comparator. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *see also Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("[I]t is not this court's responsibility to research and construct the parties' arguments." (cleaned up)). So, striking Defendants' arguments that Ms. Long is not a valid comparator cleans the case of all arguments regarding her.

because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.
### STATEMENT OF FACTS

Before setting forth the factual background, the Court addresses an argument raised by Defendants regarding Mr. Ndzana's ftatement of facts in his Brief in Opposition to Defendants' Motion for Summary Judgment, [Filing No. 67].  Defendants argue that their Statement of Facts

is deemed admitted by Mr. Ndzana because he failed to follow Local Rule 56.1(b), which requires the non-movant's brief to "include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." [Filing No. 70 at 1.] They note that Mr. Ndzana's response states, "[Mr. Ndzana] specifically disputes the following facts asserted by the Defendant in its Brief for Summary Judgment.  For ease of reference, [Mr. Ndzana] repeats the facts asserted by Defendant in italics with his response immediately following." [Filing No. 70 at 1; *see* Filing No. 67 at 1-2.]  They then highlight that Mr. Ndzana's statement of the facts does not comply with its own purported system of italicizing and responding to disputed facts. [Filing No. 70 at 1-2.]

To be sure, Mr. Ndzana's Response does not comply with its own purported system of italicizing and responding to disputed facts.  He does not use any italics or otherwise repeat Defendants' facts "with his response immediately following." [Filing No. 67 at 1-2.] He also titles his statement of the facts "Plaintiff's Statement of *Un*disputed Facts" immediately following its assertion that "[Mr. Ndzana] specifically *disputes* the following facts . . . ." [Filing No. 67 at 2 (emphases added).]  The Court does not know what to make of this contradictory, unclear, and confounding language and approach and it certainly provided no "ease of reference".  The Court strongly urges Mr. Ndzana and his counsel to approach future filings with this Court with some semblance of clarity.  That said, it does appear from Mr. Ndzana's statement of facts that he is actually disputing certain facts and thus has substantially complied with the overall obligation in L.R. 56-1(b), despite the contradictory approach.  [*Compare* Filing No. 67 at 2-14, *with* Filing No. 74 at 30.]  Therefore, the Court finds it unnecessary to deem Defendants' Statement of the Facts admitted, and instead, sets forth the following factual background pursuant to the standard detailed

6

above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Ball State's Academic Ethics Policy

The Academic Ethics Policy provides that plagiarism is an act of academic misconduct and defines the term as "intentionally or knowingly representing the words or ideas of others as one's own in any academic exercise."  [Filing No. 59-2 at 1-2 (citation omitted).]  When a faculty member accuses a student of academic misconduct, the Academic Ethics Policy provides for an internal "informal resolution" if, after a conference between the student and the faculty member, the student accepts responsibility and a resolution between the parties is agreed upon.  [Filing No. 59-2 at 3-4; Filing No. 59 at 2.]  In such cases, the parties execute a form identifying the misconduct and the agreed upon resolution and forward that form to Associate Provost Dr. McCauliff's office, where a record of the form is kept.  [Filing No. 59 at 2; *see* Filing No. 59-2 at 3-4.]

In matters where an accusation of academic misconduct and the proposed resolution are not agreed upon between the student and the faculty member, the Academic Ethics Policy provides for a "formal resolution."  [Filing No. 59-2 at 5.]  If the student denies the accusation or disagrees with the proposed resolution, the faculty member refers the matter to the Associate Provost's office for review and disposition by the Student Academic Ethics Committee.  [Filing No. 59-2 at 5; Filing No. 59 at 2.]

The Student Academic Ethics Committee is composed of one faculty member from each college, one undergraduate student from each college, one graduate student from each college, the Associate Provost, and the Dean of Students.  [Filing No. 59-2 at 6.]  Three faculty members and

two students from the Student Academic Ethics Committee are appointed to a Hearing Panel, which then receives evidence and determines a recommendation to be made to the Provost and the Vice President for Academic Affairs concerning the disposition of the matter.  [Filing No. 59-2 at 7-9.]

The Academic Ethics Policy also provides for Multiple Offense Review by the Associate Provost when a student has prior offenses on record.  [Filing No. 59-2 at 5.]  Under the Multiple Offense Review, the Associate Provost may either close the matter with no further action, may choose to impose additional consequences for the most recent violation, or may forward the matter to the Student Academic Ethics Committee for consideration.  [Filing No. 59-2 at 5-6.]  If forwarded to the Student Academic Ethics Committee, a Hearing Panel is appointed.  [Filing No. 59-2 at 6.]  After a hearing, the Hearing Panel makes a recommendation to the Provost and Vice President for Academic Affairs.  [Filing No. 59-2 at 8-9.]  The student may appeal the Hearing Panel's recommendation to the Provost and Vice President for Academic Affairs, where she may either approve the determination of the Hearing Panel, overrule or modify the Hearing Panel's recommendation, or refer the matter back to the Hearing Panel for such actions as the Provost may direct.  [Filing No. 59-2 at 9.]  The Policy provides that only the Provost and Vice President for Academic Affairs may impose the consequence of expulsion.  [Filing No. 59-2 at 10.]

**B.  Mr. Ndzana and the Counseling of Psychology Program**

Mr. Ndzana is a Black male.  [Filing No. 66-3 at 1.]  He started pursuing a doctoral degree in the Counseling of Psychology Program ("the Program") at Ball State in 2018.  [Filing No. 57-1 at 1; Filing No. 60 at 2.]  While Mr. Ndzana was in the Program, Dr. Spengler was a professor and an advisor for the students in the Program.  [Filing No. 57-1 at 1.]  Dr. Spengler had various responsibilities including assisting students in compliance with the Program's rules and

regulations, helping with course selection, reviewing submissions by the candidate regarding various departmental requirements, assisting with the selection and development of a dissertation topic, and reviewing drafts of dissertation proposals.  [Filing No. 57-1 at 1.]

Shortly after Mr. Ndzana's matriculation into the Program, Dr. Spengler became his doctoral advisor.  [Filing No. 60 at 2.]  Dr. Spengler also served as the advisor for four other doctoral students at the same time, all of whom would identify as Caucasian: Charles Hunt, Leah Crabb, Katie Allsop, and Chelsea Parker.  [Filing No. 66-1 33; Filing No. 66-1 at 58.]

The events giving rise to this lawsuit began in February 2021, in Mr. Ndzana's third year of the Program.  [See Filing No. 60 at 2.]  Until that time, both Mr. Ndzana and Dr. Spengler considered their relationship to be a normal and supportive adviser-advisee relationship.  [Filing No. 60 at 2; see Filing No. 57-1 at 1-2.]

In February 2021, both Mr. Ndzana and Mr. Hunt were scheduled to appear before doctoral committees for the oral defense of their written preliminary examination questions.  [Filing No. 57-1 at 2.]  Written preliminary examination questions are separate from a dissertation and are a crucial step in the student's progress toward the degree.  [Filing No. 57-1 at 2; see Filing No. 57-1 at 3; see Filing No. 66-1 at 9.]  Both Mr. Ndzana and Mr. Hunt had previously submitted their written answers to the preliminary examination questions, and both had been judged deficient in one or more answers.  [Filing No. 57-1 at 2.]

### C.  Dr. Spengler Discovers Plagiarism in Mr. Hunt's Answers

Mr. Hunt's oral defense was scheduled for February 25, 2021.  [Filing No. 57-1 at 2.]  Before the doctoral committee convened, Dr. Spengler discovered that Mr. Hunt had plagiarized an article of Dr. Spengler's in one of his answers.  [Filing No. 57-1 at 2-3.]  Dr. Spengler recognized the plagiarism without the help of plagiarism recognition software because Mr. Hunt had copied

sentences verbatim from Dr. Spengler's own published work from 2019.  [Filing No. 57-1 at 2-3; Filing No. 57-4.]  Dr. Spengler texted Mr. Hunt the morning of February 25, 2021, stating, "Charles, I have to forewarn you that I identified you plagiarized an SGM article in your chair-floor response.  I said you could 'lean on it.'  I need you to be forthcoming about what else you have plagiarized." [Filing No. 57-1 at 2-3; Filing No. 57-3 at 1.]  Mr. Hunt responded, stating, "I didn't mean[] to plagiarize and there is no excuse for it."  [Filing No. 57-3 at 1.]

Dr. Spengler informed Mr. Hunt that he should attend the doctoral committee meeting but that the defense of his preliminary examination questions was paused so that the doctoral committee could discuss the findings of plagiarism.  [Filing No. 57-1 at 3; *see* Filing No. 57-3 at 1.]  Dr. Spengler also suggested to Mr. Hunt that he "do an internal inventory for anymore [plagiarism], anywhere that resembles or is plagiarized.  Better to come forward up front." [Filing No. 57-3 at 1.]  Dr. Spengler further advised Mr. Hunt that since he had not yet reviewed Mr. Hunt's dissertation draft, that Mr. Hunt should take the time to review it for possible plagiarism and return it to Dr. Spengler a few days later on March 1, 2021, by 8:00am.  [Filing No. 57-1 at 3.]  Mr. Hunt timely re-submitted a draft of his dissertation to Dr. Spengler on that date.  [Filing No. 57-1 at 3.]

### D.  Dr. Spengler Consults with Others on How to Proceed Regarding the Plagiarism

Before the doctoral committee meeting, Dr. Spengler consulted with Dr. Sharon Bowman, Chair of the Department of Counseling Psychology; Dr. Ashley Hutchinson, Director of the Doctoral Program for the Department of Counseling Psychology; and Dr. Kristen McCauliff, Associate Provost, who is in charge of matters of academic dishonesty and responsible for administering the Academic Ethics Policy.  [Filing No. 57-1 at 3; Filing No. 59 at 1; Filing No. 59-2.]  Per Program policy, the matter was to be handled by the doctoral committee because Mr.

Hunt was at the stage of defending his answers before the committee.  [Filing No. 58 at 3; *see* Filing No. 58-4 at 5-8.]  Dr. McCauliff advised the doctoral committee that they had latitude to resolve the matter internally pursuant to the procedures set forth in Ball State's Academic Ethics Policy.  [Filing No. 57-1 at 3; Filing No. 59 at 4.]  She also advised that if the committee's decision required Mr. Hunt to do anything that another student who did not plagiarize would not have to do, then the matter should be reported to her office via an Academic Ethics Reporting Form. [Filing No. 57-1 at 3.]

### E.  Mr. Hunt's Committee Meets and Plans to Reconvene After Further Review

Mr. Hunt's doctoral committee met and divided up all of Mr. Hunt's preliminary examination answers to check for additional plagiarism.  [Filing No. 57-1 at 3; Filing No. 57-4.] After dividing the answers, the committee met with Mr. Hunt.  [Filing No. 57-4.]  Mr. Hunt expressed regret and explained that he was rushed and did not realize that he had plagiarized. [Filing No. 57-4.]  The committee then told Mr. Hunt that he violated Ball State's Student Academic Ethics Policy.  [Filing No. 57-4.]  The committee also challenged Mr. Hunt on "how he did not know" that he had plagiarized when "cutting and pasting from a pdf requires considerable reformatting."  [Filing No. 57-4.]  The committee adjourned to reconvene on March 15, 2021. [Filing No. 57-1 at 4.]

### F.  Dr. Andrew Davis Discovers Plagiarism in Mr. Ndzana's Answers

Mr. Ndzana's oral defense was scheduled for the next day, February 26, 2021.  [Filing No. 57-1 at 4.]  Before Mr. Ndzana's doctoral committee meeting, Dr. Spengler was advised by another professor who was also a member of Mr. Ndzana's doctoral committee, Dr. Andrew Davis, that Dr. Davis had identified plagiarism in the answer to the question authored by him.  [Filing No. 57-1 at 4; Filing No. 57-9.]  Dr. Davis recognized Mr. Ndzana's plagiarism without the help of

plagiarism recognition software "because the use of language, constructs, [and] sentence sophistication significantly shifted in [Mr. Ndzana's] response." [Filing No. 57-9.] The plagiarism consisted of "two large sections" copied from "Ross and Cisler (2020)." [Filing No. 57-9.]

Just as he texted Mr. Hunt the morning before, Dr. Spengler texted Mr. Ndzana, stating, "Fabrice I am writing to forewarn you that Dr. Davis identified extreme plagiarism in your cognate response. I need you to be prepared in today's meeting to be forthcoming about where else in your [preliminary examination questions] you have plagiarized. Your committee is being notified by me of these concerns. Plan to be initially in the waiting room until we invite you in." [Filing No. 57-7; Filing No. 57-1 at 4.]

Mr. Ndzana responded, "No problem. I will explain what happened. I do not think there are any other issues in any of my papers." [Filing No. 57-7.] Dr. Spengler then advised him to "take this opportunity to ensure your dissertation will not raise any concerns" and to "[p]lease go through it and have it to [him] by [March 1, 2021, at 8:00am]." [Filing No. 57-7.] Mr. Ndzana timely submitted his dissertation draft to Dr. Spengler on that date. [Filing No. 57-1 at 4.]

**G. Dr. Spengler Again Consults with Others on How to Proceed**

That same morning, Dr. Spengler again consulted with Dr. Bowman and Dr. Hutchinson regarding the discovery of Mr. Ndzana's plagiarism. [Filing No. 57-8.] Dr. Spengler informed them that Mr. Ndzana "cut and pasted several published paragraphs into his cognate response" and that Dr. Davis had brought it to his attention. [Filing No. 57-8.] Dr. Spengler explained that the plagiarism was "egregious." [Filing No. 57-8.] He also asked whether this plagiarism would result in Mr. Ndzana failing his preliminary examination questions. [Filing No. 57-8.]

Dr. Hutchinson responded, "I think for both [Mr. Hunt] and [Mr. Ndzana], we need to think through this issue of failing the [oral defense] and what that means. . . . I totally forgot in my email

re: [Mr. Hunt], that this was his second administration (with no remediation available to him).  The difficulty is that we as a department treat [preliminary examination] as two separate parts (written and orals) . . . .  Same for [Mr. Ndzana] – he has essentially exhausted his 3 attempts on the written exam (failed time 1; needed remediation on time 2; [Mr. Hunt] was the reverse)."  [Filing No. 57-8.]  Dr. Hutchinson then advised Dr. Spengler that he should follow the same steps as he did with Mr. Hunt's committee and discuss the issue of failing with both of them.  [Filing No. 57-8.]

### H.  Mr. Ndzana's Committee Meets and Plans to Reconvene After Further Review

Mr. Ndzana's doctoral committee met as planned and divided up all of Mr. Ndzana's preliminary examination answers to check for additional plagiarism.  [Filing No. 57-9.]  The committee then told Mr. Ndzana that he violated Ball State's Academic Ethics Policy.  [Filing No. 57-9.]  Mr. Ndzana expressed regret and stated that he did not turn in quality work, was rushed, and did not realize that he had plagiarized.  [Filing No. 57-9.]  The committee "pressed" Mr. Ndzana "on how so much material from a publication pdf could be in his [Microsoft Word] document without his knowledge."  [Filing No. 57-9.]  Mr. Ndzana explained that "he places publications side-by-side . . . to guide [himself] but was not fully cognizant of how the material was in his own document."  [Filing No. 57-9.]  The committee adjourned until March 12, 2021, to continue to review the matter.  [Filing No. 57-1 at 6.]

### I.  The Committees Use SimCheck to Check the Other Answers for Plagiarism

When Dr. Davis and Dr. Spengler first discovered that Mr. Ndzana and Mr. Hunt had plagiarized, both professors did so without the help of any software.[3]  But when each students'

---

[3] Recall that Mr. Hunt's plagiarism was evident to Dr. Spengler because Mr. Hunt copied sentences from Dr. Spengler's own work, and Mr. Ndzana's plagiarism was evident to Dr. Davis "because the use of language, constructs, [and] sentence sophistication" shifted significantly.  [Filing No. 57-1 at 2-3; Filing No. 57-4; Filing No. 57-9.]

doctoral committees divided up the students' preliminary examination answers to check them all for plagiarism, the committee members used a software program called SimCheck. [Filing No. 57-1 at 13; Filing No. 57-13; Filing No. 57-14.]

SimCheck is a software that compares an uploaded document to its database of published and unpublished works and identifies parts of the uploaded document as possible plagiarism and links the passage to the source of the possible plagiarism. [Filing No. 57-1 at 13.] SimCheck does not identify plagiarism—it simply checks the uploaded document against the database. [Filing No. 57-1 at 13-14.] As explained on the SimCheck website, "[a] high similarity score does not always suggest that a piece of writing has been plagiarized, just as a low similarity score does not always indicate that no plagiarism has occurred." *Interpreting the Similarity Score*, Turnitin, https://help.turnitin.com/simcheck/user/the-similarity-report/interpreting-the-similarity-score.htm#:~:text=SimCheck%20does%20not%20check%20for,review%20in%20the%20match (last visited Feb. 6, 2024). [Filing No. 57-1 at 14; *see also* Filing No. 66-1 at 23 (Dr. Spengler's recognition and acceptance of this concept).] The process is therefore interactive and requires the examiner to click on the identified sources and compare that information to the questioned passages in the uploaded document. [Filing No. 57-1 at 14.]

Dr. Spengler provided instructions to Dr. Davis via e-mail on how to use SimCheck so that Dr. Davis could check the preliminary answers assigned to him[4] when the committees divided up the answers to check for further plagiarism.[5]  [Filing No. 66-8 at 1-3.]

### J.  Dr. Spengler Continues to Consult on How to Proceed with Both Students

Dr. Spengler continued to consult with Dr. Hutchinson, Dr. Bowman, Dr. McCauliff, Ball State's legal counsel, the Dean of the Graduate School, and the Associate Dean of the Graduate School concerning how to proceed.  [Filing No. 57-1 at 6.]  On March 10, 2021, Dr. Spengler received two emails from Dr. Bowman with instructions on how to proceed.  [Filing No. 57-1 at 6-7; Filing No. 57-11; Filing No. 57-12.]  Dr. Bowman first advised Dr. Spengler and Dr. Hutchinson to proceed "via the academic dishonesty policy."  [Filing No. 57-11.]  Dr. Bowman then sent another email to both Dr. Spengler and Dr. Hutchinson later in the day that listed three options for the doctoral committees to consider: (1) "student not found in violation of the academic dishonesty policy, and the resolution being that the student proceed to orals"; (2) "student's response considered poor writing and academic dishonesty, and the resolution being whatever you decide (e.g., student required to rewrite the offending sections, or some other resolution that you

---

[4] Dr. Davis was a member of both students' doctoral committees and was assigned to check answers from both students.  [Filing No. 57-4; Filing No. 57-9.]

[5] Mr. Ndzana acknowledges that Dr. Spengler provided instructions on how to use SimCheck to Dr. Davis but appears to insinuate that Dr. Spengler taught Dr. Davis how to use SimCheck so that Dr. Davis would discover and ultimately accuse Mr. Ndzana of plagiarism.  [*See* Filing No. 67 at 6 ("Although Dr. Davis discovered the inconsistencies with [Mr.] Ndzana's preliminary examination paper, [Dr.] Spengler was the faculty who communicated with [Dr.] Davis regarding the alleged severity of the offense, [and] instructed [Dr.] Davis on how to use the [SimCheck software] . . . .).]  The disingenuous characterization of Mr. Ndzana's admitted plagiarism as an "inconsistency" aside, viewing in the light most favorable to Mr. Ndzana, the Court notes that nothing can be extrapolated from the fact that Dr. Spengler helped Dr. Davis use SimCheck because Dr. Spengler only helped Dr. Davis after Dr. Davis had already identified and accused Mr. Ndzana of plagiarism.

all determine), or"; (3) "student found in significant violation of the academic dishonestly policy and the paper is found unacceptable and not eligible for revision or rewriting." [Filing No. 57-12.] Dr. Bowman also instructed Dr. Spengler and Dr. Hutchinson to "not act on the [preliminary answers] defense until the academic dishonesty situation is resolved.  Once this issue is resolved (including any appeals by the student working through the system), only then would the committee meet for [defense of the preliminary answers]." [Filing No. 57-12 (emphasis omitted).]

### K.  Mr. Ndzana's Committee Reviews All of His Answers for Plagiarism

Prior to Mr. Ndzana's committee reconvening on March 12, 2021, Dr. Spengler received information from the committee members of their SimCheck reviews of Mr. Ndzana's written answers for plagiarism.  [Filing No. 57-1 at 8.]  Dr. Spengler drafted a report combining the committee members' findings.  [Filing No. 57-1 at 8; Filing No. 57-13.]  Dr. Spengler noted that each of Mr. Ndzana's responses identified plagiarism at differing levels:

- Cognate response 30%;

- Floor-Chair response 13%;

- Third Administration of DSK response 12%;

and that it equated to "extensive" plagiarism because it was mostly in the form of whole sentences and paragraphs that were copied and pasted into his answers.  [Filing No. 57-13.]

### L.  Mr. Hunt's Committee Reviews All of His Answers for Plagiarism

Similarly, prior to Mr. Hunt's committee reconvening on March 15, 2021, Dr. Spengler received information from Mr. Hunt's committee members of their SimCheck reviews of Mr. Hunt's written exam answers for plagiarism.  [Filing No. 57-1 at 8.]  Dr. Spengler drafted a report combining the committee members' findings.  [Filing No. 57-1 at 8; Filing No. 57-14.]  Dr. Spengler noted that each of Mr. Hunt's responses identified plagiarism at differing levels:

- Cognate response 7%;

- Floor-Chair response 10%;

- Third Administration of DSK response 11%;

and that some of the plagiarism was in the form of copying and pasting paragraphs and sentences directly.  [Filing No. 57-14.]

### M. Mr. Ndzana's Committee Meets and Decides How to Proceed

Mr. Ndzana's committee met on March 12, 2021, to discuss what to do about the plagiarism.  [Filing No. 57-1 at 8-9; Filing No. 57-15.]  The committee deliberated on the three options outlined by Dr. Bowman and voted three-to-one on the second option—that the paper be considered poor writing and academic dishonesty with stipulations that he be directed to re-write his answers without plagiarism and write a ten-page paper on the topic of plagiarism.  [Filing No. 57-1 at 10; Filing No. 57-15.]  Dr. Spengler was the dissenting vote and, at the same time, introduced an alternative motion that the committee select option 3 (dismissal), which was voted down by a vote of one-to-three.  [Filing No. 57-1 at 10.]  Dr. Spengler explained that he "cast [his] dissenting vote and introduced [the] alternative motion [to select option 3 (dismissal)] based upon [his] opinion that the amount of plagiarism found on Mr. Ndzana's preliminary examination answers was extensive and warranted dismissal."  [Filing No. 57-1 at 10.]

The committee then decided that Mr. Ndzana's due date for the papers identified in the second option was April 9, 2021.  [Filing No. 57-1 at 10; Filing No. 57-15.]  The committee also decided that if there was no plagiarism in the re-write and if Mr. Ndzana chose not to appeal, then the committee would reconvene for the oral defense of his preliminary answers on April 16, 2021.  [Filing No. 57-1 at 10; Filing No. 57-15.]  The committee explained its decision to Mr. Ndzana.  [Filing No. 57-1 at 10-11; Filing No. 57-15 at 2.]

17

After the meeting, Dr. Spengler prepared the Student Academic Ethics Reporting Form that detailed the committee's decision.   [Filing No. 57-1 at 11; Filing No. 57-16.]   The Form provides details of the allegation and the proposed resolution and states near the bottom that, "[b]y signing below the student is admitting to the Student Academic Ethics allegation and accepting the resolution." [Filing No. 57-16.]   The Form also provides for two check boxes that the student can mark if the student disagrees with the accusation or resolution.   [Filing No. 57-16.]   Mr. Ndzana signed the Form and left blank the check boxes, indicating no disagreement.   [Filing No. 57-16.]   Dr. Spengler then sent the form to Associate Provost Dr. McCauliff.   [Filing No. 57-1 at 11; Filing No. 59 at 4.]

**N.  Mr. Hunt's Committee Meets and Decides How to Proceed**

Mr. Hunt's committee met on March 15, 2021, to discuss what to do about his plagiarism.   [Filing No. 57-1 at 11-12; Filing No. 57-17.]   They deliberated on the three options outlined by Dr. Bowman and voted four-to-zero on the second option—that the paper be considered poor writing and academic dishonesty with stipulations that he be directed to re-write his answers without plagiarism and write a ten-page paper on the topic of plagiarism.   [Filing No. 57-1 at 11-12; Filing No. 57-17.]   Dr. Spengler indicated that he voted for the motion because he did not consider Mr. Hunt's plagiarism to be as extensive as that of Mr. Ndzana's.   [Filing No. 57-1 at 12.]   The committee decided that Mr. Hunt's due date for the papers was April 14, 2021.   [Filing No. 57-1 at 12; Filing No. 57-17.]   The committee also decided that if there was no plagiarism in the re-write and if Mr. Hunt chose not to appeal, then the committee would reconvene for the oral defense of his preliminary answers on April 26, 2021.   [Filing No. 57-1 at 12; Filing No. 57-17.]   The committee explained its decision to Mr. Hunt.   [Filing No. 57-1 at 13; Filing No. 57-17.]

After the meeting, Dr. Spengler prepared the Student Academic Ethics Reporting Form that detailed the committee's decision.  [Filing No. 57-1 at 11; Filing No. 57-18.]  Just as Mr. Ndzana did, Mr. Hunt signed the form and did not check the boxes, indicating no disagreement with the accusation or resolution.  [Filing No. 57-18.]  Dr. Spengler also sent the form to Associate Provost Dr. McCauliff.  [Filing No. 57-1 at 13; Filing No. 59 at 5.]

**O.  Dr. Spengler Reviews Mr. Ndzana's Dissertation Draft and Finds Plagiarism**

After the March 12, 2021 meeting where Mr. Ndzana was shown the plagiarism in his preliminary answers via comparison of his language and that of published works, Dr. Spengler informed Mr. Ndzana that he had not yet reviewed Mr. Ndzana's March 1, 2021 dissertation draft due to his busy schedule, so he gave Mr. Ndzana until March 15, 2021 to submit another draft. [Filing No. 57-30 at 5; Filing No. 57-30 at 2.]  Mr. Ndzana did not submit another draft by March 15, 2021.  [Filing No. 57-30 at 5; Filing No. 57-30 at 2.]  According to Dr. Spengler, "[t]here was no agreement reached at [Mr. Ndzana's] committee meeting on March 12, 2021, that the review of his dissertation draft was paused while he did his remedial work."  [Filing No. 57-1 at 13.] According to Mr. Ndzana, however, "[d]uring a zoom call between Dr. Spengler and [him] following the committee's meeting [on March 12, 2021], [he and Dr. Spengler] agreed [that Mr. Ndzana] will need to review [his] proposal again and resubmit it to him for review after oral defense."  [Filing No. 57-32 at 6.]

On March 21, 2021, Dr. Spengler reviewed Mr. Ndzana's March 1, 2021 dissertation draft that Mr. Ndzana guaranteed did not have plagiarism in it.  [Filing No. 57-1 at 14; Filing No. 57-20 at 2; Filing No. 57-30 at 1; Filing No. 57-30 at 5.]  Upon review, Dr. Spengler "went ahead and checked his draft for plagiarism" via SimCheck.  [Filing No. 57-1 at 13.]  SimCheck reported a

gross similarity score of 12%.[6] [Filing No. 57-1 at 14.] Dr. Spengler then performed an analysis on the material that SimCheck flagged as plagiarism. [Filing No. 57-1 at 14; Filing No. 57-19; Filing No. 57-20.] He discovered unoriginal sentences that had been copied and pasted from a dissertation previously published by another student and a couple of unoriginal sentences that had been taken from an article published in 2010. [Filing No. 57-20; Filing No. 57-19.]

That same day, Dr. Spengler sent an email to Dr. Bowman and Dr. Hutchinson alerting them of the plagiarism, attaching the SimCheck report and a summary of what was plagiarized, and stating, "I would appreciate [your] thoughts." [Filing No. 57-1 at 14; Filing No. 57-21 at 2-3.] Both Dr. Bowman and Dr. Hutchinson expressed shock and suggested making sure that Mr. Ndzana understood what they were identifying as plagiarism. [Filing No. 57-21.]

Because Mr. Ndzana's dissertation was still a draft and not deemed ready by himself or Dr. Spengler for presentation to his doctoral committee or scheduled for an oral defense, the matter of plagiarism did not go through his doctoral committee. [Filing No. 57-1 at 16; Filing No. 59 at 5-6.] Rather, the matter of plagiarism was to be handled by Dr. Spengler, who "was deemed the equivalent of his instructor of record, as would be the case for a teacher in a classroom who discovered plagiarism." [Filing No. 57-1 at 16; *see also* Filing No. 59 at 5-6.] Dr. Spengler followed the procedures outlined in the Policy, which included notifying Mr. Ndzana of the allegation and meeting with him within five business days of the discovery of plagiarism. [Filing No. 57-1 at 16; Filing No. 57-22.]

---

[6] SimCheck originally reported a similarity score of 57%, but that appears to have been attributed to one of Mr. Ndzana's earlier draft dissertations being in the database. [Filing No. 57-20 at 3.] Once Dr. Spengler removed that draft as a document that SimCheck should compare against, the score was 12%. [Filing No. 57-20 at 3.]

**P.  Dr. Spengler Meets with Mr. Ndzana Regarding Plagiarism on His Dissertation Draft**

During the meeting, Dr. Spengler noted that Mr. Ndzana:

> expressed considerable pain and explained he had diligently read every line to ensure there was no plagiarism.  [Mr. Ndzana] could not account for how there was plagiarism, and that he did not recall there was.  [Mr. Ndzana] stated he used Grammarly to check his document which said there was no plagiarism.  [Mr. Ndzana] said he was purchasing SimCheck to check all future documents because he does not trust the accuracy of Grammarly.

[Filing No. 57-22.]  Dr. Spengler informed Mr. Ndzana that he would "seek additional consultation and give this time before deciding how to proceed."  [Filing No. 57-22.]

After the meeting with Mr. Ndzana, Dr. Spengler texted Dr. Bowman and Dr. Hutchinson, stating:

> Just got off about an hour Zoom with [Mr. Ndzana].  It was horrible.  I'm not sure dismissal is the right thing.  If you leave it to my discretion, which I believe is consistent with policy, I will still fill out the form and submit it to the Associate Provost but, with explanation stating I am satisfied with his response.  He essentially cried the whole time, and said he went through it line-by-line.  He ran it through Grammarly which said there is no plagiarism.  He planned to purchase SimCheck to use for all future versions [because] he didn't trust Grammarly.  There's other aspects that justify me moving on.  My discretion?

[Filing No. 57-23 at 1.]

Dr. Bowman replied:

> Are you serious?  Are you serious here?  He has been plagiarizing for the past 8 months at least.  I specifically gave you an option that could allow him to demonstrate whether he understood what plagiarism was, and you questioned me on my need to do so.  Just today you indicated there was nothing he could say to persuade you not to put him out of the program.  His behavior and the tacit approval of his committee effectively says "go to Ball State and perform poorly; they won't do anything about it."  I do not support any of this.  I cannot make you fill out the form and recommend dismissal as I was not there, but be clear that I don't support this decision.

[Filing No. 57-23 at 1-2.]

Dr. Spengler replied: "You should have been there. I think it's the same thing we already dealt with and he tried but he didn't correct it.  I don't think he'll ever do it again. I'll think about this some more.  Thanks Sharon."  [Filing No. 57-23 at 2.]

Dr. Hutchinson responded:

> Think about it over the weekend Paul. I might gently offer that I don't think it matters if he'll ever do it again.  Plagiarism on [the preliminary answers] was enough to warrant dismissal, but the 3 other committee members did not support [dismissal].  And perhaps get some distance from this, and some objectivity / outside input.  Regardless, I'd like to consult before additional action, as I'm in line with Sharon - and others we've consulted along the way - that I cannot justify him staying in the program.  Think, get some clarity, and drink a beer for gods sake!

[Filing No. 57-23 at 2.]  Dr. Spengler responded with a "thumbs up" emoji.  [Filing No. 57-23 at 2.]

### Q. Dr. Spengler Recommends Mr. Ndzana's Dismissal and a Hearing Panel Is Scheduled

Ultimately, Dr. Spengler agreed with Dr. Bowman and Dr. Hutchinson.  [Filing No. 57-1 at 19; Filing No. 57-26.]  On April 2, 2021, Dr. Spengler filled out a Student Academic Ethics Reporting Form based on the plagiarism he found in Mr. Ndzana's dissertation draft and recommended that Mr. Ndzana be dismissed from the Program.  [Filing No. 57-1 at 19; Filing No. 57-26.]  Mr. Ndzana checked the boxes indicating that he did not agree with Dr. Spengler's accusation or the resolution.  [Filing No. 57-26.]  Under the Policy, the form was then forwarded to Associate Provost Dr. McCauliff for further action.  [Filing No. 57-1 at 20.]

Dr. McCauliff exercised the discretion allotted to her under the Multiple Offense Review section of the Policy and referred the accusation to a Hearing Panel of the Student Academic Ethics Committee for a determination of responsibility and recommendation to the Provost and Vice President of Academic Affairs.  [Filing No. 59 at 6.]  According to the policy of the Associate Provost's office, whether or not an offense is a subsequent offense is determined by the dates of

the allegations, not the dates of the underlying conduct.  [Filing No. 59 at 6.]  Therefore, since the

date of Mr. Ndzana's dissertation plagiarism allegation was after the date of his preliminary

examination answers plagiarism allegation, the dissertation allegation was treated as a multiple

offense.  [Filing No. 59 at 6.]  A Hearing Panel was assembled to hear the accusation regarding

plagiarism in Mr. Ndzana's dissertation and was scheduled for May 3, 2021.  [Filing No. 59 at 8.]

### R.  Mr. Ndzana Files a Complaint of Unlawful Discrimination

On April 8, 2021, Mr. Ndzana filed a Complaint of Unlawful Discrimination with Ball

State's Director of Instructional Equity and Internal Investigations, John Bowers.  [Filing No. 61

at 1-2; Filing No. 61-2.]  Mr. Ndzana alleged that Dr. Spengler was discriminating against him by

treating him differently than Mr. Hunt.  [Filing No. 61-2.]  Mr. Bowers explained to Mr. Ndzana

that pursuant to the Policy, the investigation and determination of his allegation of discrimination

would be merged into the May 3, 2021 hearing.  [Filing No. 61 at 2-3.]

### S.  Dr. Spengler Reviews Mr. Hunt's Dissertation Draft

On April 20, 2021, Dr. Spengler submitted via SimCheck the dissertation draft that Mr.

Hunt had submitted to him on March 1, 2021.  [Filing No. 57-33.]  SimCheck reported a gross

similarity score of 17%.  [Filing No. 57-33.]  Mr. Hunt's committee reviewed the SimCheck report

and agreed that the report "showed no evidence of plagiarism."  [Filing No. 57-37.]  A review of

the SimCheck report indicated false positives—the phrases and sentences that were flagged for

plagiarism included standard language, such as:

- formal information on the cover page ("A Dissertation Submitted to the Graduate School in Partial Fulfillment of the Requirements for the Degree Doctor of Counseling Psychology"); ("Dissertation Advisor: Dr. Paul M. Spengler Ball State University Muncie, Indiana");

- where research will be obtained from ("the Department of Counseling Psychology, Social Psychology, and Counseling at Ball State University");

- the email signature of Dr. Spengler; and

- standard language in a research study questionnaire ("What Will My Participation Involve? Your participation in this study is completely voluntary").

[Filing No. 57-33.]  Since the doctoral committee did not find plagiarism, Mr. Hunt remained in the Program through the rest of 2021.  [Filing No. 57-1 at 22.]  Mr. Hunt completed his remedial work that was assigned for the plagiarism in his preliminary examination answers, and in October 2021, he presented his dissertation proposal to his doctoral committee for defense.  [Filing No. 57-1 at 22.]  The committee decided not to approve it and told Mr. Hunt to scale down the extent of his study, revise it, and re-submit.  [Filing No. 57-1 at 22.]

**T.  Mr. Ndzana's Hearing Panel**

Meanwhile, Mr. Ndzana's the Hearing Panel met on May 3, 2021, and both Dr. Spengler and Mr. Ndzana presented written material prior to the hearing and called individuals as witnesses. [Filing No. 59 at 8; Filing No. 57-30; Filing No. 59-9.]  Mr. Ndzana admitted that his dissertation draft contained plagiarism but argued that it was bias that led Dr. Spengler to recommending dismissal.  [Filing No. 57-10 at 4-5.]  He argued that it was unfair for Dr. Spengler to check his dissertation draft before he has completed the remedial work his doctoral committee ordered for his first offense, but also acknowledged that there was no understanding in writing from Dr. Spengler that the review of his dissertation draft was paused while he worked on his remedial assignments and that he did not request such clarification.  [Filing No. 57-10 at 4-6.]

At the conclusion of the hearing, Dr. McCauliff asked both parties if they thought they had had a fair hearing, and both answered affirmatively.  [Filing No. 59 at 9; Filing No. 59-10 at 5.] During deliberations, the Hearing Panel determined that Mr. Ndzana committed multiple acts of plagiarism and that recommending dismissal was appropriate.  [Filing No. 59-10 at 5-6.]  The committee "took seriously the consideration of discrimination.  However, the committee did not

find the charge of discrimination to be sufficiently illustrated or documented." [Filing No. 59-10 at 5.] The committee "also argued that they did not have enough information about the other student Mr. Ndzana referenced to use it in their decision-making." [Filing No. 59-10 at 5.]

Mr. Ndzana appealed the recommendation of the Hearing Panel to Dr. Rivera-Mills, Provost and Vice President for Academic Affairs. [Filing No. 62 at 2; Filing No. 62-2.] Dr. Rivera-Mills upheld the recommendation after reviewing the documentation and Mr. Ndzana's appeal, noting that her decision was based on his admissions of plagiarism and that he had received a fair hearing. [Filing No. 62-3.] Mr. Ndzana was dismissed from the Program. [Filing No. 58-10.]

### U. Mr. Ndzana Sends a Letter to the Counseling Psychology Department Regarding Plagiarism in Mr. Hunt's Dissertation

On January 22, 2022, Mr. Ndzana sent a letter to a faculty member in the Counseling Psychology Department in which he attached a copy of a SimCheck analysis of Mr. Hunt's dissertation draft that reported a similarity score of 44%. [Filing No. 60 at 11-12.] The elevated score was attributable to content that Mr. Hunt plagiarized from the dissertation of Amy Mitchell, a previous Ball State student who finished her dissertation in 2019 but placed a two-year embargo of its publication online. [Filing No. 60 at 11-12; Filing No. 63 at 2-3.] The embargo meant that her work was not discoverable by search engines or capable for comparison until July 2021. [Filing No. 63 at 2-3.]

### V. Dr. Spengler Submits Mr. Hunt's Latest Dissertation Draft to SimCheck and Finds Extensive Plagiarism

On January 24, 2022, Dr. Spengler was informed that he should check Mr. Hunt's dissertation draft because of a complaint that accused Mr. Hunt of plagiarism. [Filing No. 57-1 at 22.] Dr. Spengler ran Mr. Hunt's dissertation through SimCheck on January 26, 2022, and it

reported a similarity score of 36%, which was 16% higher than the check he performed on April 20, 2021. [Filing No. 57-1 at 22-23; Filing No. 57-35.] Dr. Spengler performed a deep dive on the material flagged as plagiarism and discovered that Mr. Hunt extensively plagiarized from the dissertation of Ms. Mitchell, who was a former student of Dr. Spengler's. [Filing No. 57-1 at 23.]

Dr. Spengler was Ms. Mitchell's doctoral advisor and thus supervised her dissertation. [Filing No. 66-1 at 10-12.] He was familiar with her work, had studied the same topic, read over drafts of her dissertation, and sent her dissertation to students to guide them and provide them with an example of a good dissertation. [Filing No. 66-1 at 11-13.]

On January 27, 2022, Dr. Spengler notified Mr. Hunt of his findings and that since his dissertation was before his doctoral committee, the matter would be handled by the committee pursuant to the Academic Ethics Policy. [Filing No. 57-36.] Mr. Hunt's doctoral committee met on February 4, 2022, and agreed that Mr. Hunt's dissertation contained multiple instances of plagiarism. [Filing No. 57-37 at 1.] The committee reviewed the same three options that Dr. Bowman had outlined for the committee when they considered his first offense of plagiarism. [Filing No. 57-37 at 2.] Dr. Spengler moved that the committee select the third option—dismissal. [Filing No. 57-37 at 2; Filing No. 57-1 at 25.] Two members voted against the motion and one abstained. [Filing No. 57-37 at 2.] Another member moved to select the second option—the response considered poor writing and academic dishonesty with stipulations that Mr. Hunt must submit all subsequent documents through SimCheck. [Filing No. 57-37 at 2; *see* Filing No. 57-1 at 26.] The motion was approved by a vote of two-to-one, with Dr. Spengler against it, and another member abstaining. [Filing No. 57-37 at 2.] Dr. Spengler testified that he voted for dismissal because the plagiarism was the same as in Mr. Ndzana's case. [Filing No. 57-1 at 26.]

Mr. Hunt accepted the resolution, and a second Academic Ethics Reporting Form was filled out and sent to Associate Provost Dr. McCauliff's office. [Filing No. 57-1 at 26-27; Filing No. 57-38.] Associate Provost Dr. McCauliff exercised her discretion under the Multiple Offense Review section of the Academic Ethics Policy, just as she had done in Mr. Ndzana's case, and referred the matter to a Hearing Panel of the Student Academic Ethics Committee. [Filing No. 59 at 10.] A Hearing Panel convened on March 17, 2022, and ultimately recommended that Mr. Hunt be dismissed. [Filing No. 59 at 11; Filing No. 59-12.] Mr. Hunt filed an appeal, but Provost Dr. Rivera-Mills agreed with the Hearing Panel's recommendation and ordered that Mr. Hunt be dismissed from the Program. [Filing No. 62-5.]

### W. Ms. Rawan Atari

In 2018, Ms. Rawan Atari was a first-year student in the Program enrolled in a class with Dr. Spengler and had submitted a paper in which she plagiarized. [Filing No. 66-6 at 1; Filing No. 67 at 10; Filing No. 71-1 at 2.] Pursuant to the Academic Ethics Policy, Dr. Spengler met with Ms. Atari within five days of the accusation of plagiarism to discuss it. [*See* Filing No. 66-6 at 1-2.] After meeting and discussing with Ms. Atari, Dr. Spengler concluded that she did not "understand how to accurately represent the three different meta-analytic findings written up verbatim in the paper each of the three times that represented plagiarism" and was satisfied with her response. [Filing No. 66-6 at 1.] Dr. Spengler consulted with Dr. Bowman and other colleagues on how to proceed. [*See* Filing No. 66-6 at 1.] Dr. Spengler ultimately lowered her grade in the class as a result. [Filing No. 66-6 at 1.]

### X.  The Lawsuit

Mr. Ndzana filed this lawsuit on August 3, 2022.  [Filing No. 1.]  Mr. Ndzana sued Ball State for race discrimination in violation of Title VI[7] and the Board of Trustees, Dr. Rivera-Mills, and Dr. Spengler "in their official capacity, prospective and injunctive relief and in their individual capacity, for violating [Mr. Ndzana's] clearly established right to equal protection" via § 1983.[8] [Filing No. 21 at 1.]  He seeks injunctive relief in the form of reinstatement in the Program and damages.  [Filing No. 21 at 7.]

### IV.
### DISCUSSION

Imprecise    pleading,    generalized    briefs    by    both    parties,    and    inflammatory

---

[7] It is unclear whether Mr. Ndzana also brought a Title VI claim against the Board of Trustees and the individual Defendants because in his Amended Complaint under "Count I: Title VI – Race Discrimination," he alleges that "Defendants'" (plural) violated Title VI.   [Filing No. 21 at 6.] Nevertheless, the Court construes Mr. Ndzana's Title VI claim only against Ball State.  Although the question of whether individuals can be sued directly under Title VI has not yet been answered by the United States Supreme Court or the Court of Appeals for the Seventh Circuit, "the answer can be found in Title IX of the Civil Rights Act, which was 'modeled after Title VI' and 'operate[s] in the same manner.'"  *Rogers v. Office of the Att'y Gen.*, 2017 WL 2864950, at *2 (N.D. Ind. July 5, 2017) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)); *see Patterson v. McLean Sheriff's Dept.*, 2021 WL 2403436, at *9 (C.D. Ill. June 11, 2021) (same); *C.S. v. Couch*, 843 F. Supp. 2d 894, 905 n.14 (N.D. Ind. 2011) (noting the same in dicta).  Title IX claims can only be brought against a recipient of federal grant money and not an individual.  *Smith v. Metropolitan Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019 (7th Cir. 1997).  Given the relationship between Title IX and Title VI, so too can Title VI claims be brought only against a recipient of federal grant money and not an individual.  *Rogers*, 2017 WL 2864950, at *2; *Patterson*, 2021 WL 2403436, at *9; *Griffin v. UW Sys. Bd. of Regents*, 2019 WL 5218980, at *4-5.  Therefore, the Court construes Mr. Ndzana's Title VI claim as against Ball State only.

[8] It is likewise unclear based on the Amended Complaint, [Filing No. 21], and the Statement of Claims, [Filing No. 49], whether Mr. Ndzana brought a § 1983 claim against Ball State or just the individual Defendants.

28

misrepresentations of the record by Mr. Ndzana[9] have led to a lack of clarity in the claims presented, the analysis thereof, and the structure of this case, not to mention a waste of the Court's time.  Nevertheless, the Court proceeds by addressing the parties' arguments in the order and manner in which they raise them, consistent with the rule of party presentation.  *Bernacchi v. First Chic. Ins. Co.*, 52 F.4th 324, 328 (7th Cir. 2022) ("[T]he party presentation rule . . . stands for the proposition that parties 'frame the issues for decision,' whereas the courts play 'the role of neutral arbiter of matters the parties present.") (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)).  Despite the shortcomings in the briefs and Mr. Ndzana's misrepresentation of the record, the Court has done its best to identify and analyze the parties' arguments and evidence as

---

[9] For instance, Mr. Ndzana represented that Dr. Spengler "testified that it was easy to identify [Mr.] Ndzana's alleged plagiarism within his doctoral dissertations because '[i]t's not hard to recognize your own writing.'" [Filing No. 67 at 4.]  A review of the record, however, shows that this is a clear misrepresentation of Dr. Spengler's testimony.  The part of Dr. Spengler's testimony that Mr. Ndzana cites to is not testimony that relates to Mr. Ndzana.  Rather, Dr. Spengler was explaining that he found the plagiarism in Mr. Hunt's—not Mr. Ndzana's—preliminary answers because Dr. Spengler recognized his own writing.  [Filing No. 66-1 at 113.]  Mr. Ndzana also cherry-picks phrases from Dr. Spengler's deposition regarding how and when Dr. Spengler had discretion on handling offenses of academic dishonesty.  [*See* Filing No. 67 at 5-7.]  When the testimony is read in context, however, and alongside the rest of the evidence, it is clear that Mr. Ndzana overstates and mischaracterizes the discretion that Dr. Spengler had, especially pertaining to the first offense of plagiarism, the handling of which was done at the committee's discretion and by voting, not solely by Dr. Spengler.  Mr. Ndzana's characterization that Dr. Spengler "chose to bring a first offense via the formal resolution process after reading [his] Preliminary Answers" is also a blatant misrepresentation of the record.  [Filing No. 67 at 5.]  First, Dr. Davis—not Dr. Spengler—discovered and accused Mr. Ndzana of plagiarism in his preliminary answers.  [Filing No. 57-9.]  Second, the committee—not solely Dr. Spengler—ultimately addressed the offense and voted on it.  [Filing No. 57-9; Filing No. 57-15.]  And third, Mr. Ndzana's first offense was resolved via the informal—not formal—resolution process of the Academic Ethics Policy.  *See supra* Section II.E (Ball State's Academic Ethics Policy).  [*See* Filing No. 57-9; Filing No. 59-2; Filing No. 57-15; Filing No. 57-16.]  These "shenanigans" are unacceptable, costly, wasteful, and do not comport with the duty of candor to the Court.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (scolding a party for their disappointing approach on summary judgment that was based on mischaracterizing the record, cherry-picking isolated phrases, and ignoring of unfavorable evidence).

presented.

**A. Immunity**

Defendants argue that Ball State is immune from suit under § 1983 and that Dr. Spengler and Dr. Rivera-Mills in their official capacities are immune from claims for monetary damages under § 1983, pursuant to the Eleventh Amendment.  [Filing No. 74 at 36-37.]

In response, Mr. Ndzana concedes that Ball State is immune as a state entity.  [Filing No. 67 at 16.]  He also clarifies/concedes that, in their official capacities, Dr. Spengler and Dr. Rivera-Mills are immune from claims for monetary damages under § 1983 and that he is not seeking monetary damages from them in their official capacities.  [Filing No. 67 at 15-16.]  Rather, he clarifies that he sued both individuals in their official capacity with respect to prospective injunctive relief and in their individual capacity for monetary damages.  [Filing No. 67 at 15-16.]

Defendants do not address immunity in their reply brief.  [Filing No. 70.]

Imprecise pleading led to this argument,[10] but Mr. Ndzana's responsive briefing resolves the issue without the need for the Court's substantive analysis.  Because Mr. Ndzana concedes that Ball State is immune as a state entity under § 1983 pursuant to the Eleventh Amendment, Defendants' Motion for Summary Judgment, [55], is **GRANTED** to the extent that Mr. Ndzana brought a § 1983 claim against Ball State.  And based on Mr. Ndzana's concession/clarification regarding his § 1983 claims against Dr. Spengler and Dr. Rivera-Mills, Mr. Ndzana's § 1983 claims

---

[10] As footnoted above, it is unclear based on the Amended Complaint, [Filing No. 21], and the Statement of Claims, [Filing No. 49], whether Mr. Ndzana was attempting to bring a § 1983 claim against Ball State or just the individual Defendants.

will only be understood as official capacity claims for prospective injunctive relief[11] and individual capacity claims for monetary damages.

### B.  Whether Mr. Ndzana's § 1983 Claims Are Barred by His Title VI Claim

Next, Defendants argue that Mr. Ndzana's § 1983 claims are barred by his Title VI claim because he is pleading the same claim under two different statutes.  [Filing No. 74 at 37-38.] Defendants argue that Title VI has its own comprehensive enforcement mechanism, and it cannot be bypassed by bringing a Title VI suit under § 1983 instead of complying with certain requirements in Title VI.  [Filing No. 74 at 38.]

Mr. Ndzana responds that his § 1983 claims are based on a violation of the Equal Protection Clause and thus are not displaced by Title VI because Title VI was not intended to be the exclusive remedy for addressing discrimination in schools.  [Filing No. 76 at 15.]

Defendants repeat the same arguments as to why Mr. Ndzana's § 1983 claims should be stricken.  [Filing No. 70 at 6.]

Defendants misconstrue Mr. Ndzana's § 1983 claims.  Section 1983 is a cause of action for the violation of federal statutory or constitutional rights.  42 U.S.C. § 1983.  Although not pled with clarity, Mr. Ndzana's § 1983 claims are based on a violation of the Equal Protection Clause by the individual Defendants—not a violation of Title VI.  [See Filing No. 21 at 1 ¶ 1 (Amended Complaint); see also Filing No. 49 (Plaintiff's Statement of Claims).]  In other words, Mr. Ndzana

---

[11] Interestingly, neither party discusses how injunctive relief against Dr. Spengler and Dr. Rivera-Mills would work given that both are no longer employed by Ball State, something that both parties have admitted to.  [Filing No. 21 at 3 ("Dr. Susana Rivera-Mills *was* employed by Ball State . . . ."; "Dr. Paul Spengler *was* employed by Ball State . . . .") (emphases added); Filing No. 74 at 6 (noting that Dr. Spengler is retired and that Dr. Rivera-Mills is the "*former* Provost and Vice President for Academic Affairs") (emphasis added).]  Nevertheless, because the parties do not address this, the Court does not either.

is not bringing a Title VI claim via § 1983—he is bringing a Title VI claim against Ball State via Title VI and equal protection claims against the individual Defendants via § 1983.

The case that Defendants cite in support of their argument that Mr. Ndzana's § 1983 claims are barred, *Alexander v. Chicago Park District*, 773 F.2d 850 (7th Cir. 1985), does not apply to the circumstances of this case. *Alexander* held that "private actions based on Title VI may not be brought under Section 1983." *Id.* at 856. But as explained, Mr. Ndzana is not bringing § 1983 claims based on Title VI, so this case does not help Defendants. At this juncture, there is nothing wrong with Mr. Ndzana bringing a Title VI race discrimination claim against Ball State and race-based equal protection claims against Dr. Spengler and Dr. Rivera-Mills.

### C.  Discrimination Claims

Defendants' third and fourth arguments address the merits of Mr. Ndzana's claims. But before summarizing the arguments and turning to the merits, the Court addresses the parties' briefing on the merits. Both parties clump all of their arguments together in a wholesale fashion without differentiating between the Title VI and § 1983 claims or differentiating by Defendant, except that Defendants whisper in a footnote that Mr. Ndzana's § 1983 equal protection claims are analyzed by the same standard as Title VI discrimination claims, so their Title VI argument should therefore "be read to also apply" to the § 1983 claims. [Filing No. 74 at 38-39.] Nowhere does Mr. Ndzana even attempt to separate his claims with any structure, address whether the claims are analyzed by the same standards as Defendants argue, or even address his § 1983 claims other than saying that § 1983 claims can be brought alongside a Title VI claim. [*See* Filing No. 67.] Mr. Ndzana has therefore waived any argument in opposition to Defendants' argument that all claims are analyzed by the same standard. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

The Court turns to summarizing the arguments and then structures the analysis in the order that the arguments were raised.

Defendants argue that Mr. Ndzana cannot satisfy his burden of proving a prima facie case of race discrimination.  [Filing No. 74 at 38-48.]  They argue that Mr. Ndzana fails to establish any proof using the direct method, and so his claims are analyzed pursuant to the indirect method of proof (the *McDonnell Douglas* burden-shifting framework).  [Filing No. 74 at 39.]  Since Mr. Ndzana admitted to plagiarizing, Defendants argue that Mr. Ndzana cannot establish that he was meeting the legitimate educational expectations of Ball State, which is an element of his prima facie case.  [Filing No. 74 at 40-41.]  Defendants also argue that Mr. Ndzana's prima facie case fails because he cannot identify a similarity situated comparator.  [Filing No. 74 at 41-44.]  They argue that Mr. Hunt is not a valid comparator because there was evidence of plagiarism in Mr. Ndzana's dissertation draft but no evidence of plagiarism in Mr. Hunt's dissertation at that time.  [Filing No. 74 at 43.]  Defendants further argue that even if Mr. Ndzana has demonstrated a prima facie case, they have proffered a legitimate, non-discriminatory reason for its dismissal of Mr. Ndzana (plagiarism), and Mr. Ndzana has failed to show that the reason is pretextual.  [Filing No. 74 at 44-48.]

Mr. Ndzana responds that he has established his prima facie case of discrimination via the indirect method.  [Filing No. 67 at 17-22.]  He argues that "[a]t the time of his expulsion, [he] was not on any level of academic probation and was meeting [Ball State's] legitimate education expectations."  [Filing No. 67 at 18.]  He also argues that he has identified two similarly situated comparators—Rawan Atari-Kahn and Mr. Hunt.  [Filing No. 67 at 19-20.]  He argues that despite Mr. Hunt eventually getting expelled in a similar process, he was treated differently because Dr. Spengler "would have identified" that Mr. Hunt plagiarized from Mr. Mitchell's dissertation, even

without SimCheck, and thus he hid it for a year, unlike exposing Mr. Ndzana's plagiarism. [Filing No. 67 at 21-22.] Mr. Ndzana further argues that the narrative that Provost Dr. Rivera-Mills made the decision to dismiss to Mr. Ndzana is "patently untrue" and that Dr. Spengler was the real decision maker behind dismissing Mr. Ndzana. [Filing No. 67 at 24-25.] He alleges that there is evidence of bias in that Dr. Spengler "tried to immediately expel [him] for his very first offense" and then moved forward with a second allegation of plagiarism before Mr. Ndzana "had time to remediate his papers." [Filing No. 67 at 25.] He argues that Dr. Spengler selectively and arbitrarily enforced policies based on "whether the student was black or non-black." [Filing No. 67 at 27.] He asserts that selective enforcement creates a dispute of material fact toward his prima facie case and the question of pretext. [Filing No. 76 at 28.]

Defendants reply that whether Mr. Ndzana was meeting the school's legitimate expectations merges with whether there are similarly situated comparators that were treated differently. [Filing No. 70 at 6-13.] They argue that Ms. Atari is not a valid comparator because she was a first-year doctoral student when plagiarism was discovered, and as such, was held to a different standard than students in their terminal year of the Program who "have received the benefit of years of instruction concerning the appropriate form of their work." [Filing No. 70 at 7-9.] They also argue that Mr. Ndzana's argument regarding Dr. Spengler ignoring Mr. Hunt's plagiarism of Ms. Mitchell's dissertation until he could no longer cover it up is rebutted by the fact that Dr. Spengler testified that he does not "have a photographic memory and [could not] remember or immediately recognize content from previous dissertations that he had mentored" and the fact that it was Dr. Spengler who reported Mr. Hunt's plagiarism in his preliminary answers. [Filing No. 70 at 10.] Defendants assert that the evidence shows that the decision to recommend dismissal was not Dr. Spengler's alone and that the final decision was made by Provost Dr. Rivera-Mills.

[Filing No. 70 at 14-15.]  Therefore, even if Mr. Ndzana had put forth evidence of bias on the part of Dr. Spengler, it does not matter because the independent Hearing Panel of disinterested faculty and other graduate students found Mr. Ndzana responsible and recommended dismissal, which Provost Dr. Rivera-Mills independently reviewed and agreed with.  [Filing No. 70 at 15-17.] Defendants also argue that Mr. Ndzana's argument regarding manipulation of evidence fails since Mr. Ndzana himself corroborated his misconduct and agreed that he received a fair hearing.  [Filing No. 70 at 15.]  Defendants further argue that there is no evidence of selective enforcement and that Dr. Spengler's reasons for handling other matters of plagiarism were consistent based on the level of the student and the extent of the plagiarism.  [Filing No. 70 at 17-19.]

### 1.  Applicable Law

Title VI prohibits intentional discrimination by "any program or activity receiving Federal financial assistance."[12]  42 U.S.C. § 2000d; *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015) ("Title VI prohibits only intentional discrimination.") (citation omitted).  The Equal Protection Clause of the Fourteenth Amendment prohibits state action that discriminates on the basis of membership in a protected class.  U.S. Const. Amend. XIV; *see Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010).  To evaluate race discrimination claims under both Title VI and the Equal Protection Clause, the Court asks "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the . . . adverse [educational] action."  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (legal standard for race discrimination claims under § 1983 is *Ortiz*); *A.A. v. Warsaw Cmty. Sch. Corp.*, 2023 WL 3863441, at *4 (N.D. Ind. June 7, 2023) (*Ortiz* applies to race discrimination claims under Title VI).

---

[12] The parties do not dispute that Ball State receives federal financial assistance.

Although *Ortiz* sets forth the main question the Court should consider in its analysis, the burden-shifting framework from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) "remains useful for focusing the evidence." *Barnes*, 946 F.3d at 389.   Under the *McDonnell Douglas* burden-shifting framework, "a plaintiff must first establish a prima facie case for discrimination," *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023), which includes demonstrating that (1) he is a member of a protected class; (2) his performance met the school's legitimate, nondiscriminatory expectations; (3) he suffered an adverse educational action; and (4) similarly situated students outside his protected class were treated more favorably.   *Singmuongthong v. Bowen*, 77 F4th 503, 507 (7th Cir. 2023); *Brewer v. Bd. of Trs. of Unvi. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (adjusting the elements of *McDonnell Douglas* "for the educational context").

If a prima facie case is established, "the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse [educational] action." *Singmuongthong*, 77 F.4th at 507-08 (citation omitted); *see also Vichio*, 88 F.4th at 691.   "If the defendant does so, then the burden shifts back to the plaintiff to submit evidence that the [school's] explanation is pretextual." *Singmuongthong*, 77 F.4th at 508 (citation omitted); *see also Vichio*, 88 F.4th at 691. Pretext means the reason for the adverse educational decision is a "lie" or a "phony reason." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (quotation and citation omitted). To demonstrate pretext, Mr. Ndzana must identify evidence that would permit a reasonable jury to conclude that the stated reason for his expulsion—plagiarizing on two assignments—is

"unworthy of credence." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023) (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 380 (7th Cir. 2020)).[13]

       2. *Analysis*

As explained below, Mr. Ndzana fails to both establish a prima facie case and rebut Defendants' legitimate reason for the disciplinary action. Summary judgment is appropriate because Mr. Ndzana failed to show that he was meeting the Program's legitimate educational expectations and failed to identify a similarly situated student who was treated more favorably. But even if these failures are overlooked, he has also failed to present any evidence that Defendants' articulated legitimate, non-discriminatory reason for their decision (plagiarism) was pretextual. Mr. Ndzana has likewise failed to submit any evidence sufficient for a reasonable jury to infer racial animus in accordance with *Ortiz*.

       a. <u>Prima Facie Case</u>

**       i.   Legitimate Expectations**

Mr. Ndzana argues that he was meeting the University's legitimate performance expectations and "was not on any level of academic probation" at the time of his expulsion. [Filing No. 67 at 18.] How Mr. Ndzana believes this is beyond this Court's comprehension. At the time of his expulsion, he had already plagiarized in his second administration of his preliminary

---

[13] Both parties note in passing that when performance is the reason for the adverse decision, the focus turns away from a prima facie case and looks solely to the issue of pretext. [Filing No. 74 at 39 (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009); Filing No. 67 at 18 (citing *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 936 (7th Cir. 1996).] However, both parties devote a majority of their briefing to arguing about a prima facie case. The Court knows that pretext is the main issue here. *See Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) ("We may skip the *McDonnell Douglas* prima facie analysis if the [defendant] raises the [plaintiff's] performance as the reason for the adverse [educational] action.") (citing *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023)). Nevertheless, the Court still addresses the parties' arguments in the order and manner and in which they raised them for the sake of thoroughness.

answers, of which there were three total questions where Mr. Ndzana had "copied two large sections" in one answer, [Filing No. 57-9; Filing No. 57-13; Filing No. 57-15], had sentences "taken in whole or partial sentences taken from publications" in another, [Filing No. 57-13; *see* Filing No. 57-15], and had "two sections with several sentence stems and modified sentences making up the rest using others' writing" in the third answer, [Filing No. 57-13; *see* Filing No. 57-15].  His doctoral committee had indeed placed him on a level of probation when they made him re-submit his preliminary answers without plagiarism and complete extra work to remedy the academic dishonesty violation.  And then after assuring Dr. Spengler that his March 1, 2021 dissertation draft did not have plagiarism in it, there was indeed plagiarism in it.  [Filing No. 57-32 at 2.]  "[I]n the academic realm few charges are more serious than plagiarism." *Roberts v. Columbia Coll. Chic.*, 821 F.3d 855, 864 (7th Cir. 2016).  Mr. Ndzana cannot seriously assert to this Court that, after having been accused of and admitting to copying and pasting whole sentences on several occasions, he was meeting the legitimate expectations of a graduate student enrolled at one of the highest academic levels.

### ii.    Similarly Situated Comparator

Mr. Ndzana argues that he has two similarly situated comparators that were treated more favorably than him: Ms. Atari and Mr. Hunt.[14]  Although comparators need not be identical, a comparator must be directly comparable "in all material respects so as to eliminate other possible explanatory variables." *Crain*, 63 F.4th at 592 (quotations and citation omitted).  Other possible

---

[14] Mr. Ndzana also indirectly argues about another student, Marlenne Devia, [Filing No. 67 at 18], but the evidence shows that Ms. Devia substantively failed her preliminary exam.  [Filing No. 71-1 at 6.]  Because there is no evidence that Ms. Devia was engaged in the same conduct (academic dishonesty/plagiarism), the Court easily dispenses with this argument.  *See Coleman v. Donahoe*, 667 F.3d 835, 850-51 (7th Cir. 2012) (explaining that to be comparators, the individuals must be involved in acts of comparable seriousness or violated the same rules).

explanatory variables include "[d]ifferences in experience, education, and qualifications . . . so long as the [defendant] took them into account when making the relevant . . . decisions." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).

It is easy to discard the argument regarding Ms. Atari, for she was in her first year of the Program when Dr. Spengler accused her of plagiarism in an assignment for a class, [Filing No. 71-1 at 6], a fact that was taken into consideration by the Program when it made its decision regarding her consequence, [Filing No. 71-1 at 2-3 ("as faculty we typically approach student writing problems early in their career with an attitude of patience and grace")], whereas Mr. Ndzana was in his third year and had plagiarized in a crucial assignment to his doctoral committee. A first-year doctoral student neither has the same experience nor education as a third-year doctoral student who has received two more years of faculty instruction regarding the expectations of academic writing. Based on their difference, Ms. Atari is not a valid comparator. *See id.* (finding that an individual who had two more years of education than the plaintiff was not a valid comparator).

Turning to Mr. Hunt, it is easy to see that the two are similarly situated. Both were in their third year of the Program, both had substantively failed their prior administration of the comprehensive preliminary exam, and both had committed plagiarism in their preliminary answers and dissertation. But that is not all that Mr. Ndzana must show—he must also show that "he was treated differently . . . owing at least in part to a discriminatory motive." *Adams v. Reagle*, -- F.4th ---, 2024 WL 340045, at *9 (7th Cir. Jan. 30, 2024) (analyzing whether an individual could be considered a similarly situated comparator who was treated differently in an equal protection claim of race discrimination). This is where he fails. He has not identified evidence that he was treated differently either in his first offense or second in any way that could be attributed to a discriminatory motive.

39

Mr. Ndzana argues that since Dr. Spengler checked Mr. Hunt's dissertation draft later than he checked Mr. Ndzana's, that shows he was treated differently and with discriminatory intent. Yet Mr. Ndzana fails to support the argument with any evidence of racial animus and fails to come to terms with the fact that when Dr. Spengler got around to checking Mr. Hunt's draft, he was checking Mr. Hunt's March 1, 2021 submission—the same submission that he checked for Mr. Ndzana. He attempts to imply in his arguments that Mr. Hunt was given an opportunity to fix his dissertation draft that Mr. Ndzana was not, but this argument is misleading. Although Dr. Spengler did not check Mr. Hunt's dissertation draft until after Mr. Hunt turned in his remedial assignments, he still checked the previously-submitted version from March 1, 2021. So, Mr. Hunt did not have the opportunity to incorporate anything he learned from his remedial assignments into his dissertation draft.

Mr. Ndzana also argues that he "consistently felt that [Dr.] Spengler displayed preferential treatment towards [Mr.] Hunt over [Mr.] Ndzana," and points to an email that Dr. Spengler sent to Mr. Hunt that included the words, "God Bless you My Son." [Filing No. 67 at 20-21.] This argument fails to show favorable treatment or evidence of discriminatory motive. First, Mr. Ndzana's feelings do not create an issue of fact. *See Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012) (finding that the plaintiff's "subjective beliefs" were insufficient to create a genuine issue of material fact). Second, Mr. Ndzana focuses on that one phrase and ignores the several text messages between himself and Dr. Spengler that show nothing but a deeply supportive relationship, including a text message from Dr. Spengler saying "I love you man" to Mr. Ndzana. [Filing No. 57-2.] A reasonable jury could not find that this is differential treatment or evidence of discriminatory motive.

Lastly, Mr. Ndzana argues that he was treated less favorably than Mr. Hunt because "[Dr.] Spengler would have identified any of [Mr.] Hunt's plagiarized content by first reading over his draft alone rather than putting it blindly through the plagiarism checking software." [Filing No. 67 at 21.] In other words, he argues that Dr. Spengler ignored and hid Mr. Hunt's plagiarism yet did not do the same for him. But "would have" known and knew is a distinction that Mr. Ndzana conflates. Mr. Ndzana highlights Dr. Spengler's familiarity with the topic of Mr. Hunt's and Ms. Mitchell's dissertation but fails to submit any evidence that Dr. Spengler knew that Mr. Hunt was plagiarizing Ms. Mitchell's 2019 dissertation before Mr. Ndzana sent in his letter in January 2022 or before the SimCheck report in January 2022. His speculation that Dr. Spengler knew or would have known are insufficient to create a genuine issue of material fact. *See Hanners*, 674 F.3d at 694 (finding that the plaintiff's "subjective beliefs" were insufficient to create a genuine issue of material fact).

### b. Pretext

Even if Mr. Ndzana had shown a prima facie case, Defendants say he was dismissed for plagiarism, so the burden shifts back to Mr. Ndzana to demonstrate pretext. To demonstrate pretext, Mr. Ndzana must identify evidence that would permit a reasonable jury to conclude that the stated reason for his expulsion—plagiarizing on two assignments—was a lie or was insincere. *See Crain* 63 F.4th at 593; *Barnes-Staples* 88 F.4th at 716; *Graham v. Artic Zone Iceplex, LLC,* 930 F.3d 926, 929 (7th Cir. 2019) (no pretext if the reason given was "honestly believed"). Mr. Ndzana argues that the following evidence is evidence of pretext: (1) "[Dr.] Spengler was the real decision maker as to [Mr.] Ndzana's expulsion" under the cat's paw theory; and (2) Dr. Spengler selectively enforced academic dishonesty violations. [Filing No. 67 at 23-28.] Both arguments

fail to establish a genuine issue of material fact as to pretext because neither argument is supported by evidence that suggests the proffered reason was a lie or insincere.

The cat's paw theory of liability "applies when a biased supervisor 'who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory . . . action.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461-62 (7th Cir. 2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)).  To succeed, it is not enough to show that the supervisor acted with bias; "[r]ather, a plaintiff must show that the biased supervisor's actions were a proximate cause of the adverse . . . action." *Id.* at 462 (citation omitted). Notably, proximate cause fails where there are "independently sufficient reasons [by the formal decisionmaker], such as the corroboration of the allegations, to take the adverse action." *Id.* (citation omitted).

Even assuming Mr. Ndzana submitted evidence that Dr. Spengler was biased, which he has not, he fails to establish proximate cause.  Although the recommendation of expulsion originated with Dr. Spengler, the recommendation was reviewed not by one, but by two, independent levels. The Hearing Panel, comprised of other faculty members and graduate students, corroborated the allegations and recommendation by actively cross-examining both Dr. Spengler and Mr. Ndzana and reviewing both of their submissions.  Moreover, Mr. Ndzana himself admitted that he did not have evidence that any member of the Hearing Panel was biased against him due to his race. [Filing No. 60 at 14.]  Further, the evidence shows that Dr. Rivera-Mills reviewed both the recommendation and Mr. Ndzana's appeal carefully, and upheld the recommendation based on the multiple plagiarism violations.  [Filing No. 62-3.]  Accordingly, Mr. Ndzana's cat's paw theory argument fails.  *See Martino v. MCI Comms. Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009)

(finding that the cat's paw theory fails "even if [the court] assumes [the defendant was prejudiced because] there were not one but *two* layers of bias-free analysis") (emphasis in original).

As to Mr. Ndzana's selective enforcement argument, he centers the majority of his argument on Ms. Atari, but the Court has already dispensed with that argument above. In any event, Dr. Spengler followed the Academic Ethics Policy when he addressed Ms. Atari's plagiarism. [*See* Filing No. 59-2 at 4.] Faculty members who accuse students of academic misconduct must meet with the student and then make a finding in their judgment whether the student is responsible or not. [Filing No. 59-2 at 4.] Dr. Spengler's finding of "not responsible" in Ms. Atari's case is well within his discretion under the Policy, and nowhere clouded by evidence that he made that call based on bias. [*See* Filing No. 66-6.] Mr. Ndzana also argues that there is evidence of bias and/or pretext because "[d]espite the fact that [Mr.] Ndzana's alleged first offense [of plagiarism] falls squarely within the category defined in the [Academic Ethics Policy] for misuse of sources, Dr. Spengler tried to immediately expel [him] for his very first offense." [Filing No. 67 at 25.] But this argument does not work either. Aside from the fact that Mr. Ndzana has already admitted to plagiarism as opposed to "misuse of sources," Dr. Spengler explained that he "cast [his] dissenting vote and introduced [the] alternative motion [to expel Mr. Ndzana] based upon [his] opinion that the amount of plagiarism found on Mr. Ndzana's preliminary examination answers was extensive and warranted dismissal." [Filing No. 57-1 at 10.] Mr. Ndzana submits nothing to discredit Dr. Spengler's legitimate reason for his vote.

In conclusion, the summary judgment record shows that Mr. Ndzana's race had no role in his expulsion. He fails to establish discrimination under *McDonnell Douglas* and does not offer other evidence for a reasonable jury to infer discrimination under *Ortiz*. The stated basis of his dismissal was admitted plagiarism, and it was not pretextual. Accordingly, all of Mr. Ndzana's

claims fail. *See Williams v. Seniff*, 342 F.3d 774, 791 (7th Cir. 2003) (the conclusion of an inadequate showing under *McDonnell Douglas* applied to both equal protection and Title VII claims).

## V.
### CONCLUSION

Mr. Ndzana admitted to two instances of plagiarism and was terminated from the Program as a result of that plagiarism. There is no evidence that the decision to terminate him was for any reason other than that plagiarism. Based on the undisputed facts, Mr. Ndzana's claims all fail as a matter of the law, and for the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, [55]. Final judgment shall enter accordingly.

Date: 2/7/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**